UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARIE DELVA and JEAN MARIE DELVA,<br><br>      Plaintiffs,<br><br>v.<br><br>PREFERRED PROPERTY SOLUTIONS,<br>LLC; KYLE SEYBOTH; CHRIS MESSIER;<br>LOWELL WILLIAMS; RED BALLOON<br>CAPITAL, LLC, and SEYBOTH REAL<br>ESTATE TEAM, INC.,<br><br>      Defendants. | No. 1:26-cv-84 |

COMPLAINT

## I.    INTRODUCTION

1.    After scamming two elderly Haitian immigrants out of the $400,000 home that they had owned for almost thirty years, providing them the relatively paltry sum of $100,000 in exchange, defendant Kyle Seyboth explained the circumstances to the plaintiffs' panicked daughter thusly, "I own the house.  It's my fu[-----] house.  It's my house."  Mr. Seyboth is wrong.

2.    Plaintiffs Marie Delva and Jean Marie Delva (collectively the "Debtors" or the "Delvas"), both debtors in separate cases under chapter 13, Title 11 of the United State Code (the "Bankruptcy Code") before the United States District Court for the District of Rhode Island, bring this action to:  a) recover the prepetition fraudulent transfer of exempt property, to wit, their residence located at 58 Pekin Street, Providence, Rhode Island 02908 (the "Property"); b) seek a determination that the foreclosure rescue scam through which they lost the Property was in fact a

loan transaction and to recharacterize the conveyance of the Property as an equitable mortgage; c) have the usurious loan transaction declared void; and d) for monetary relief under applicable law.

3.    Defendants collectively orchestrated or participated in a foreclosure rescue scam and, through a bait-and-switch, took the Debtors' $400,000 home for $100,000 while requiring repayment of $280,000 within a year for the Debtors to get their home back.  In designing this transaction, certain Defendants candidly referred to the transaction as a loan when communicating among themselves, and referred to the Debtors' periodic payments as "mortgage payments."

4.    Only weeks before the closing and the transfer of the Property to defendant Preferred Property Solutions, LLC ("PPS"), defendant Lowell Williams explained the transaction in a text message to the assistant to a closing attorney (who ultimately refused to be involved) and defendant Kyle Seyboth, as follows:

> Jun 18, 2023 at 5:13 PM
>
> Kacie - just to confirm, this is the cleanest way of doing this deal —
>
> PEKIN DEAL:
>
>     1   Red Balloon gives 280k mortgage for first position.
>
>     2   Pay 60k mortgage payoff. Client receives 40k.
>
>     3   Client has 1 year to refinance out.
>
>     4   Client pays monthly mortgage until refinance
>
>                              60k to payoff
>                              40k to client

5.    A paralegal employed by a closing attorney who refused to be involved in the transaction sought clarification about the transaction and the resulting interest rate via text message on June 21, 2023 (the "June 21 Text Messages") and asked:

> So the client will be paying you 180,000 more than you gave them when all is said and done correct?
>
> Are you sure it's not 15% because the attorney is telling me it was 15% interest

6.    In response that same day Kyle Seyboth confirmed not only that the Debtors would receive $100,000 and would need to repay $280,000 pursuant to a "note," but that the $280,000 itself would bear interest at 15 percent, stating:

> Kyle S
> Yes 280 note
>
> **K**  Sorry 15%
>
> +1 (401) 226-4006
> Thank you
>
> Kyle S
> Yw

7.    Only days later a transaction that had been proposed as a loan refinancing, albeit an unconscionably usurious one, was actually documented as a sale of the Property from the Debtors to PPS for $100,000.

8.    A year after that, in July 2024, Mr. Seyboth, a principal of PPS, was demanding access to the Property so that he could obtain photographs and list the Property for sale for $450,000 and displace the Debtors from the home they had purchased almost thirty years prior while depriving them of the almost $390,000 in equity the Debtors had accumulated.

9.    The Defendants took advantage of homeowners who speak limited English and who had no intention of selling their home in order to strip them of almost $400,000 of home equity accumulated over decades.

10.    The Defendants, acting in concert, scammed the Debtors out of title to their home, made numerous false and misleading representations to induce the Delvas to execute a real estate

sales contract, and obtained the Delvas' signatures under false pretenses to sell their interests in their home to PPS.

## II.    PARTIES

11.    Plaintiff Marie Delva is an individual residing at 58 Pekin Street, Providence, Rhode Island.  Ms. Delva is an elderly Haitian immigrant with limited English proficiency employed as a Certified Nursing Assistant and is a debtor in a case under chapter 13 of the Bankruptcy Code.

12.    Plaintiff Jean Marie Delva is an individual residing at 58 Pekin Street, Providence, Rhode Island.  Mr. Delva is an elderly Haitian immigrant with limited English proficiency.  He is now retired and previously worked as a factory worker at Hope Global in Cumberland, Rhode Island.  Mr. Delva is a debtor in a case under chapter 13 of the Bankruptcy Code.

13.    PPS is a foreign limited liability company organized under the laws of Massachusetts with a principal office located at 377 Wilbur Avenue #113, Swansea, Massachusetts 02777 and is registered to conduct business in Rhode Island.  PPS is the current record owner of the Property.

14.    Defendant Kyle Seyboth is an individual residing at 6 Dennell Drive, Lincoln, Rhode Island.  Mr. Seyboth is a member and manager of PPS; member and manager of Red Balloon Capital, LLC; is owner and President, Treasurer, Secretary, and Director of The Seyboth Team Real Estate, Inc.

15.    Defendant Chris Messier is a member and manager of PPS and is licensed to do business in Rhode Island as a real estate salesperson.

16.    Defendant Lowell Williams resides at 54 Stonelaw Avenue, Providence, Rhode Island 02908.  At all relevant times Mr. Williams was an agent of PPS and Red Balloon Capital,

LLC who was authorized to, and did in fact, negotiate transactions, communicate with counsel, and accept payments non behalf of these entities.

17.     Defendant Red Balloon Capital, LLC is a foreign limited liability company organized under the laws of Massachusetts with a principal office located at 969 Waterman Avenue, East Providence, Rhode Island 02914 and is registered to conduct business in Rhode Island.

18.     The Seyboth Real Estate Team, Inc. is a foreign corporation organized under the laws of Massachusetts with a principal office located at 969 Waterman Avenue, East Providence, Rhode Island and is registered to conduct business in Rhode Island.

19.     Non-party Louis Catarina is an individual residing at 18 Sophia Lane, Greenville, Rhode Island and is attorney licensed to practice law in the State of Rhode Island.

20.     Non-party Indeglia & Associates, Attorneys at Law, P.L.L.C. ("Indeglia & Associates") is a foreign professional limited liability company organized under Delaware law with a principal office at 5200 Tamiami Trail North, Suite 101, Naples, Florida and is registered to conduct business in Rhode Island.  During events relevant to the claims set forth in this action Mr. Catarina was an employee of Indeglia & Associates.

## III.    JURISDICTION AND VENUE

21.     The Court has jurisdiction over this action under 28 U.S.C. § 1334(b) as the claims asserted arise under the Bankruptcy Code or otherwise are related to a case under the Bankruptcy Code.

22.     Venue is proper in this Court under 28 U.S.C. § 1409.

## IV.     FACTUAL ALLEGATIONS

### A.     58 Pekin Street, Its Owners, Family, and Mortgage Obligation

23.     Marie and Jean Marie Delva were married from 1982 to 2018 and divorced in 2018. They both continue to live at the Property with other members of their family.

24.     The Delvas purchased the Property in 1995. Upon their divorce, they became owners of the Property as tenants in common by operation of law.

25.     Upon information and belief, in May 2023 the Delvas were notified by their mortgage servicer, Wells Fargo, that they were being referred for foreclosure.

26.     The remaining pay-off balance on the Delvas' mortgage on 58 Pekin Street was $62,408.01 on July 24, 2023.

27.     At the time of the challenged transfer of the Property to PPS on July 24, 2023, the value of 58 Pekin Street exceeded any mortgage or debt secured by the property by nearly $400,000.

### B.     Defendants' "Foreclosure Rescue" Scheme

28.     Defendants' "foreclosure rescue" scheme combines elements of common scams specifically identified by the Federal Deposit Insurance Corporation: repurchase scams and refinance scams.

29.     The FDIC describes a repurchase scam as follows:

> **Lease-Back or Repurchase Scams** – In this scenario, a promise is made to pay off [an owner's] delinquent mortgage, repair [their] credit and possibly pay off credit cards and other debt. However, in order to do this, [they] must "temporarily" sign [their] deed over to a "third party" investor. [They] are allowed to stay in the home as a renter with the option to purchase the home back after a certain amount of time has passed or [their] financial situation improves. The trouble is once [they] have signed away [their] rights in [their] property, [they] may not be able to repurchase the property later, even if [they] can and want to. After the new owner takes ownership of [their] property, the new owner can evict [them]. Furthermore, the

scammer is under no obligation to sell the house back to [them]. Typically, after the deed is signed away, the property changes hands numerous times. The scammer may have taken a new mortgage out on [their] home for hundreds of thousands of dollars more than [their] mortgage, making it impossible for [them] to buy back [their] home.[1]

30.     The FDIC describes a refinance scam as follows:

**Refinance Scams** – . . . . The scammer presents [them] with "foreclosure rescue" loan documents to sign. [They] are told that the documents are for a refinance loan that will bring the mortgage current. What [they] don't realize is that [they] are surrendering ownership of [their] home. The "loan" documents are actually deed transfer documents, and the scammer counts on [them] not actually reading the paperwork. Once the deed transfer is executed, [they] believe [their] home has been rescued from foreclosure for months or even years until [they] receive an eviction notice and discover [they] no longer own [their] home. At that point, it is often too late to do anything about the deed transfer.[2]

31.     Defendants, acting in concert, targeted the Debtors, who were at risk of losing their home in foreclosure, with offers to help them keep possession and ownership of their home.

32.     On May 31, 2023, Lowell Williams emailed Kyle Seyboth and provided a list of properties threatened with pending foreclosure. This list included the Property. Mr. Seyboth received this list and indicated to Mr. Williams that he would review it.

33.     From the perspective of someone perpetrating a foreclosure rescue scam the Debtors' home was an ideal target as the balance of the foreclosing mortgage ($62,408.01) was small in comparison to the value of the home (approximately $400,000) such that a relatively small outlay of capital by the "rescuer" would yield the potential of a short-term return that is multiples of the capital invested. In addition, the owners of the Property were elderly, had only limited education and lacked English proficiency.

---

[1] *Beware of Mortgage Rescue Scams: If It's Too Good to be True, It Probably Is*, FED. DEPOSIT INS. CORP., (Mar. 2016), https://www.fdic.gov/consumers/loans/prevention/rescue/images/foreclosurescam.pdf.
[2] *Id.*

**C.      Initial Solicitation and Deceptions**

34.      Within days of Mr. Williams providing a list of pending foreclosures to Mr. Seyboth, Thelma Howard a real estate agent affiliated with The Seyboth Real Estate Team, Inc., who is supervised by Mr. Seyboth, visited the Property.

35.      Specifically, in or around June 2023, Thelma Howard approached Marie Delva while Ms. Delva was outside at the Property and asked her how much she would sell her home for. Marie responded that she would sell it for $400,000, if she were to sell it, and then asked Ms. Howard if she did reverse mortgages.  Ms. Howard answered "Yes" and gave Ms. Delva her business card, saying that someone would follow up.  After the conversation, Marie gave Thelma's business card to her daughter, Joana Delva, because she had not fully understood what they had discussed.

36.      The following day, Lowell Williams came to the Property and identified himself as a real estate agent.

37.      Lowell Williams told Marie Delva that he was at her home because Ms. Delva was interested in a "reverse" or "refinance."

38.      Ms. Delva told Lowell Williams she did not want to sell her home.

39.      Ms. Delva understood her conversations with Mr. Williams to be negotiating a refinancing of her mortgage.

40.      Mr. Williams led Marie Delva and her daughter Joana Delva to believe that he could help them by connecting them to somebody with the financial capacity and willingness to save their home from foreclosure.

### D.     June 9 Rescue Offer

41.     On June 9, 2023, Lowell Williams texted Joana Delva an invitation to "come down to the office Monday or Tuesday for paperwork" and setting forth the following "Terms of Financial Agreement" ("June 9 Text Messages"):

- "We will cover June Mortgage,"
- "We will pay off your existing mortgage balance,"
- "This will save the house from foreclosure and release you from previous mortgage obligations,"
- "We will be added to Title as Tenants in common with your mom,"
- "She will remain on the deed,"
- "You will keep ownership with me as tenants in common,"
- "You will be responsible for new mortgage amount to be paid over 30 years amortized," and
- "We will take our names the title and transfer sole ownership back to you with new mortgage not exceeding a comfortable monthly mortgage cost for your mom."

### E.     June 21 Meeting with Lowell Williams

42.     On June 15, 2023, Lowell Williams spoke with Joana Delva by phone and explained that Kyle Seyboth was willing to offer $100,000 to complete the transaction proposed in the June 9 Text Messages, through which $100,000 would be paid to the Debtors to pay off the existing Wells Fargo mortgage with the Debtors retaining $40,000 in proceeds.

43.     On June 21, 2023, Marie and Joana Delva met with Lowell Williams at a real estate office in East Providence, where Lowell introduced Marie and Joana to representatives of PPS.

44.     No representative from PPS communicated or provided any information or documents to Marie Delva that she comprehended.

45.     At the meeting, representatives of PPS explained, in English, that the Delvas could not own a house for three years because of their foreclosure and then described the terms of a deal, which they believed matched the June 9 Text Messages.

46.     The meeting lasted approximately fifteen to twenty minutes.

F.    **The Purchase and Sale Agreements**

47.    Notwithstanding Lowell Williams' indications in the June 9 Text Messages that the Delvas would retain title to the Property, and the June 21 Text Messages in which Kyle Seyboth indicated that $100,000 would be provided to the Debtors in exchange for a $280,000 note bearing interest at 15 percent, on or about June 28, 2023 the Debtors were provided a purchase and sale agreement for the Property (the "June 28 P&S") that they did not understand and that they believed to be related to a refinancing of the Property.

48.    The June 28 P&S provided for the sale of the Property by the Debtors to PPS for $100,000.

49.    The June 28 P&S indicated that Kyle Seyboth was acting as broker both for the sellers (i.e., the Debtors) and for the buyer (i.e., PPS).

50.    The June 28 P&S indicated that the current occupants of the Property (i.e., the Debtors) would be able to remain in the Property following the sale.

51.    The June 28, P&S indicated that PPS as buyer would have five days to review all rental agreements related to the Property or else would be deemed to accept the terms of occupancy of the current occupants of the Property.

52.    The Debtor's signed the June 28 P&S on June 28, 2023.

53.    Contrary to the indication in the June 28 P&S, the Debtors did not engage Kyle Seyboth to act as the broker with respect to the sale of the Property and did not sign any agency or listing agreement with Mr. Seyboth.

54.    Contrary to the terms of the June 28 P&S, the Debtors did not provide PPS, as buyer under the June 28, 2023 P&S, copies of any agreements relating to the occupancy of the Property.

55.    PPS did not object to any of the terms of occupancy of the Property by the Debtors within five days of the June 28 P&S.

56.    To secure repayment of the $100,000 to be paid by PPS to the Debtors, on June 29, 2023 Joana Delva executed a Purchase and Sale Agreement (the "June 29 P&S") that purported to require Joana Delva to purchase the Property from PPS, on or before July 1, 2024, for $280,000.

57.    The repurchase price under the June 29 P&S matched the amount that Messrs. Seyboth and Williams had previously characterized as a loan repayment amount in their June 21 Text Messages.

**G.    July 24 Meeting and Alleged Sale**

58.    Upon information and belief, due to the refusal of the law office that was party to the June 21 Text Messages to assist in the transaction unless the Debtors were represented by separate counsel, the Defendants sought out a different attorney to assist and close the transaction.

59.    On July 24, 2023, the Delvas and Joana Delva met with Louis Catarina, an attorney, at the Warwick office of Indeglia & Associates.

60.    Before the meeting began, Joana Delva informed the office receptionist that her parents could not communicate in English and would need an interpreter.

61.    No interpretation services were provided during conversations, and no translation services were provided relative to the documents the Delvas were given to sign.

62.    At the meeting, Attorney Catarina presented the Delvas with a series of documents written in English and explained the documents in English.

63.    The Delvas believed the documents were a refinancing agreement.

64.    Marie Delva explicitly stated at this meeting that she did not want to sell the Property.

65.    Notwithstanding Ms. Delva's indication that she did not want to sell the Property, Attorney Catarina presented the Debtors with a warranty deed to convey the Property to PPS for

the sum of $100,000 and a form HUD-1 reflecting the amounts due from PPS and due to the Debtors in connection with the sale of the Property to PPS.

66.     The HUD-1 prepared by Mr. Catarina reflected that he charged the Debtors a legal fee of $1,000 and a document preparation fee of $400.

67.     The documents were signed by the Debtors and notarized by Louis Catarina.

68.     Attorney Caratina's notarization of the warranty deed executed by the Debtors indicated that the conveyance of the Property was their free act and deed notwithstanding Marie Delva's explicit indication in Mr. Catarina's presence that she did not want to sell the Property.

69.     The signed documents did not refinance the Debtors' mortgage.

70.     The signed documents did not convey an interest in the Property to Joana Delva.

71.     The signed documents purported to convey title to the Property from the Debtors to PPS.

72.     The Debtors did not receive copies of the documents they signed at the time of the transfer of the Property to PPS.

73.     At no point prior to Summer 2024 did the Debtors realize that they had sold the Property to PPS at the July 24 meeting.

74.     At no point prior to Summer 2024 did the Debtors understand that the documents they had signed were not effectuating a refinancing.

75.     At no point did anyone explain, or attempt to explain, to the Debtors the true substance or nature of the documents from the July 24 meeting.

**H.     Events Following the Alleged Sale**

76.     Following the alleged sale of the Property the Debtors did not provide keys to the Property to PPS or any representative thereof.

77.     Following the alleged sale of the Property the Debtors and their family members remained in possession of the Property without any written agreement regarding terms of their occupancy or payment obligations associated therewith.

78.     Despite the lack of any written agreement detailing the Debtors' payment obligations, Lowell Williams instructed the Debtor's daughter, Joana Delva, that the Debtors were required to make monthly payments to Red Balloon Capital, Inc. in the amount of $1,350 per month.

79.     The Debtors, understanding only that they had refinanced their existing mortgage, made payments to Red Balloon Capital, Inc. as instructed believing them to be mortgage payments due as a result of their refinancing.

80.     The Debtors' made payments to Red Balloon Capital, Inc. through cashier's checks delivered, in some instances, to Lowell Williams, and in other instances to the East Providence office of Red Balloon Capital, Inc.

81.     Following the alleged sale of the Property, the water, sewer and other utility services to the Property remained in the names of the Debtors.

82.     Following the alleged sale of the Property, the Debtors made modifications and improvements to the Property, including renovation of a kitchen and rewiring, consistent with their belief that they owned the Property.

83.     The modifications and improvements to the Property were paid for by the Debtors with what they believed to be the net loan proceeds of a refinancing of their prior mortgage with Wells Fargo.

84.     The electrical work paid for by the Debtors was intended to allow for compliance with applicable smoke detector requirements and to ensure that the smoke detectors at the Property would pass inspection.

85.     Despite PPS's contention that it is the owner of the Property, PPS did not pay for or undertake the electrical work required to ensure compliance with smoke detector requirements applicable to property owners.

86.     Following the completion of the electrical work required to comply with applicable fire safety requirements, PPS advanced approximately $10,000 to satisfy utility arrearages for service to the Property to enable inspection of the smoke detectors that the Debtors had paid to upgrade.

87.     In connection with this additional advance on December 7, 2023, Lowell Williams emailed Ryan Lutrario, an attorney at Indeglia & Associates, on December 7, 2023 stating, "Ryan - we need to amend the P&S for Pekin St from 280 to 320…We are giving them [i.e., the Debtors] *an additional loan*." (Emphasis added.)

88.     Chris Messier, a principal of PPS and Red Balloon Capital, Inc., was copied on this email and replied on December 7, 2023 stating, "I thought we were paying for the smokes and *adding that to the loan*." (Emphasis added.)

89.     Mr. Williams confirmed Mr. Messier's understanding that PPS was increasing the amount of the loan provided to the Debtors replying, "Yes that is what we are doing.  They paid for the smokes.  We are covering the electricity bill so that we can get it inspected and obtain the smoke cert."

90.     Ultimately, the June 29 P&S was not amended to increase the repurchase price from the Property from $280,000 to $320,000 as suggested in Mr. Williams' December 7, 2023 email to

Attorney Lutrario.  Instead, in May, 2024 a new purchase and sale agreement (the "Elevator Properties P&S") regarding the Property was executed by Joana Delva and Elevator Properties, Inc., a Rhode Island corporation controlled, and upon information and belief owned, by Kyle Seyboth.  The Elevator Properties P&S required Joana Delva to repurchase the Property for a purchase price of $375,000 on or before July 1, 2024.

91.     At the end of May 2024, a mortgage broker that Lowell Williams had engaged to assist Joana Delva in obtaining a loan to repurchase the Property informed Joana Delva and Lowell Williams that Joana would not qualify for the financing required to repurchase the Property for $375,000.

92.     Due to Joana Delva's inability to obtain the financing needed to repurchase the Property, both the Elevator P&S and the June 29 P&S expired.

**I.      Aftermath of the Alleged Sale**

93.     On or around July 3, 2024, Kyle Seyboth and The Seyboth Real Estate Team, Inc. listed 58 Pekin Street for sale for $450,000.

94.     The sale of the Property by PPS was temporarily restrained by the Rhode Island Superior Court in an action by the Rhode Island Attorney General alleging that the Defendants and others affiliated with them had violated the Rhode Island Deceptive Trade Practices Act.

95.     PPS has sought relief from the automatic stay in each of the Debtors' chapter 13 cases in order to dispossess them from the home of more than 30 years.

96.     By deceiving and misleading the Delvas through their misrepresentations, Defendants sought to deprive the Delvas of their equity in their home and to induce the Delvas to give their signature under false pretenses on a real estate sales contract to sell their longtime home.

97.     This sale was orchestrated by Defendants, despite the Debtors' expressly stated interest in alternative solutions like refinancing and despite the Debtors' complete lack of intent to sell their interests in their home to Preferred Property Solutions.

98.     By preying on the Debtors' financial distress and limited English proficiency, Defendants unfairly and deceptively induced the Debtors to convey to PPS a home that they never intended to sell for consideration that was a fraction of the Property's actual value.

## V.    CAUSES OF ACTION

### A.    COUNT I:  RECHARACTERIZATION AS EQUITABLE MORTGAGE

99.     The Debtors incorporate the allegations contained in paragraphs 1 through 98 of this Complaint as if fully stated here.

100.    PPS, Seyboth, Williams and Messier referred to the $100,000 advanced in June 2023, and later additional advance of approximately $10,000 to satisfy the Delvas' utility arrearages, as a loan to the Debtors.

101.    Defendants understood PPS's advance of funds to the Debtors to be a loan of $100,000 for which the Debtors would be required to repay $280,000 in one year.

102.    The Delvas understood that the advances received from PPS to be a loan given to refinance their prior mortgage.

103.    In exchange for extending an additional $10,000 to satisfy the Debtors' utility arrearages during the term of the original loan from PPS, the amount that the Debtors would be required to repay to retain the Property was increased.

104.    The total amount of funds advanced to the Debtors was grossly inadequate consideration for the Property such that the Debtors would not, and would have no reason to, accept the total amount of advances from PPS in exchange for the Property.

105.    Following the alleged sale of the Property the Debtors continued to have exclusive control and possession of the Property and continued to make improvements thereto in manner consistent with their continued ownership of the Property.

106.    Following the alleged sale of the Property PPS did not take possession or control thereof.

107.    The alleged sale of the Property and the deed through which title was conveyed to PPS were in actuality a loan transaction through which the conveyance of the Property to PPS provided security for the repayment of the funds advanced to the Debtor.

**B.    COUNT II:  USURY**

108.    The Debtors incorporate the allegations contained in paragraphs 1 through 107 of this Complaint as if fully stated here.

109.    The substantive terms of the transaction between PPS required that, in exchange for an initial $100,000 advance by PPS, PPS would need to be repaid $280,000 in one year resulting in an effective interest rate of 180 percent per annum.

110.    The resulting interest rate of 180 percent exceeds the statutory maximum rate of interest of 21 percent provided by R.I. Gen. Laws § 6-26-2.

111.    Pursuant to R.I. Gen. Laws § 6-26-4 PPS's loan to the Debtors, and the deed conveying the Property to PPS that was given as security therefor, are void.

**C.    COUNT III:  R.I. Gen. Laws § 9-1-2**

112.    The Debtors incorporate the allegations contained in paragraphs 1 through 111 of this Complaint as if fully stated here.

113.    While acting in his capacity as an agent of PPS and Red Balloon Capital, Lowell Williams represented to Joana Delva that, to prevent the foreclosure of the Property, the Debtors

would not lose an ownership interest in the Property and that they would be responsible for payment of a new mortgage to be amortized over 30 years with a "comfortable" mortgage payment.

114.    Mr. Williams, on behalf of PPS and Red Balloon Capital, made these false representations to Joana Delva to deceive the Delvas into conveying the Property to PPS.

115.    The Delvas relied upon the representations made by Mr. Williams and executed the documents they believed would effectuate the refinancing of their existing mortgage, consistent with Mr. Williams' false representations that they would have a "comfortable" mortgage payment and avoid foreclosure, without understanding the effect of the documents that they had executed.

116.    The conveyance of the Property to PPS, in reliance upon the false representation made by Mr. Williams on behalf of PPS and Red Balloon Capital, resulted in the Debtors' loss of more than $300,000 of equity in the Property.

117.    PPS obtained the Property from the Delvas as a result of Mr. Williams' false pretenses on its behalf, in violation of R.I. Gen. Laws § 11-41-4, and, therefore, committed larceny.

118.    The Debtors suffered damage as a result of PPS's larceny.

**D.    COUNT IV:  RHODE ISLAND RACKETEER INFLUECED AND CORRUPT ORGANIZATION ACT**

119.    The Debtors incorporate the allegations contained in paragraphs 1 through 118 of this Complaint as if fully stated here.

120.    Defendants PPS, Messrs. Seyboth, Messier, Williams, Red Balloon Capital and The Seyboth Real Estate Team, Inc. acted collectively as an enterprise in order to strip the Debtors of more than $300,00 of equity in the Property and to allow PPS to retain that value for their own benefit.

121.    In furtherance of the object of the enterprise, PPS, by committing larceny in obtaining the Property through false pretenses, engaged in racketeering activity.

122.    Red Balloon Capital, which received the Debtors' periodic payments of $1,350 per month, and PPS, which required payment of $280,000 in exchange for its advances of approximately $100,000, engaged in racketeering activity through the collection of an unlawful debt.

123.    The Debtors were injured by the racketeering activity of the enterprise by their loss of more than $300,000 in equity in the Property.

E.    **COUNT V:  FRAUDULENT TRANSFER**

124.    The Debtors incorporate the allegations contained in paragraphs 1 through 123 of this Complaint as if fully stated here.

125.    The transfer of the Property to PPS by the Debtors is voidable by the trustee in the Debtors' chapter 13 bankruptcy cases pursuant to 11 U.S.C. § 544 and R.I. Gen. Laws §§ 6-16-4 and 6-16-5.

126.    The trustee in the Debtors' chapter 13 bankruptcy cases has not sought to avoid the transfer of the Property to PPS.

127.    The Debtors' transfer of the Property to PPS was not voluntary. The Debtors, due to Mr. Williams' misrepresentations, believed that they were refinancing their existing mortgage, did not understand that they were transferring title to the Property to PPS, and, when attending the July 24, 2023 meeting including Attorney Catarina Mrs. Delva explicitly stated that she did not want to sell the Property.

128.    The Debtors could have exempted their interests in the Property pursuant to 11 U.S.C. § 522(b)(3) and R.I. Gen. Laws § 9-26-4.1 had it not been transferred to PPS.

129.    At the time of the transfer of the Property to PPS, each of the Debtors was insolvent in that their liabilities exceeded the value of their non-exempt assets at fair valuation.

130.    At the time of the transfer of the Property to PPS, each of the Debtors lacked the ability to pay their debts as they became due and had:  a) failed to timely pay their existing mortgage loan from Wells Fargo; and b) accrued significant arrearages for utilities at the Property.

131.    The Debtors transferred their interest in the Property, which had a value of approximately $400,000, to PPS for significantly less than reasonably equivalent value.

### F.    COUNT VI:  DECLARATORY JUDGMENT

132.    The Debtors incorporate the allegations contained in paragraphs 1 through 131 of this Complaint as if fully stated here.

133.    The Debtors contend that they did not, in fact, transfer the Property to PPS, that they were deceived into executing the deed that effectuated the alleged transfer of the Property to PPS, and that they did not intend to convey their title to the Property to PPS for $100,000.

134.    The Debtors understood and believed that in executing the documents as described above, they were refinancing their existing mortgage with Wells Fargo.

135.    PPS contends that it is the owner of the Property by virtue of the deed executed by the Debtors on July 24, 2023.

136.    An actual controversy exists between the Debtors and PPS requiring the Court's declaration of the parties' respective rights.

137.    Under Rhode Island law, the transfer of a fee interest in real property requires that the grantors have a present intention to fully divest themselves of their interest in the subject property and to transfer the property to the grantee.

138.    The Debtors lacked such an intention in executing the deed through which PPS allegedly gained title to the Property and executed that deed only because they were fraudulently induced to execute documents that they did not understand believing that they were refinancing their existing mortgage.

139.    PPS was aware of the Debtors' understanding as Ms. Delva explicitly stated, prior to executing the deed by which PPS claims to have acquired title to the property, that she did not intend to sell the Property.

140.    Due to the fact that the Debtors did not intend to divest themselves of their interests in the Property and convey those interests to PPS, the Debtors did not effectively deliver the deed conveying title to the Property to PPS and the conveyance is of no effect.

## VI.    PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, the Debtors demand the following relief:

A.    On Count I, that the Court determine that the transaction through which the Property was purportedly conveyed to PPS was actually a loan and that the deed purporting to convey the Property to PPS was given only for security and is in actuality, and in equity, a mortgage to secure repayment of PPS's advances of fund to the Debtors;

B.    On Count II, that the Court determine that PPS committed usury in contracting for a loan to the Debtors at an interest rate exceeding 21 percent per annum and that the deed purporting to convey the Property to PPS as security for the usurious loan is void pursuant to R.I. Gen. Laws § 6-26-2;

C.    On Count III, that the Court award damages, pursuant to R.I. Gen. Laws § 9-1-2, for the larceny perpetrated by defendants PPS, Williams and Red Balloon Capital equal to twice the value of the Debtors' equity in the Property at the time of the alleged conveyance to PPS;

D.    On Count IV, that the Court award treble damages, pursuant to R.I. Gen. Laws § 7-15-4 jointly and severally, against defendants Seyboth, Williams, Messier, PPS, Red Balloon Capital and The Seyboth Real Estate Team, Inc. equal to three times

the value of the Debtors' equity in the Property at the time of the purported transfer of the Property to PPS;

E.      On Count IV, that the Debtors be awarded their attorneys' fees to be paid by defendants Seyboth, Williams, Messier, PPS, Red Balloon Capital and The Seyboth Real Estate Team, Inc.;

F.      On Count V, that the Court enter judgment avoiding the purported transfer of the Property to PPS;

G.      On Count VI, that the Court enter a declaratory judgment declaring the purported transfer of the Property by the Debtors to PPS to be void and of no effect;

H.      On all counts, that the Debtors be awarded their costs; and

I.      Provide for such additional relief as the interests of justice may require.

## JURY DEMAND

The Debtors hereby demand a trial by jury of all issues so triable.

MARIE DELVA and
JEAN MARIE DELVA

By their attorney,

/s/ Steven J. Boyajian
Steven J. Boyajian (#7263)
Robinson & Cole LLP
One Financial Plaza, 14th Floor
Providence, RI 02903
Tel. (401) 709-3359
Fax. (401) 709-3399
sboyajian@rc.com

Dated:  February 9, 2026